**CITY OF TACOMA, Department of Public Utilities, Light Division, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–697C.

United States Court of Federal Claims.

Sept. 24, 1997.

See also 28 Fed.Cl. 637, 31 F.3d 1130.

G.S. Karavitis, Tacoma, WA, with whom was Mark L. Bubenik, for plaintiff.

Franklin E. White, Jr., Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Richard E. Rice for defendant. Bryan R. O'Boyle, Dept. of the Air Force, of counsel.

## *OPINION*

LYDON, Senior Judge.

This contract case is before the court on defendant's motion for summary judgment and plaintiff's cross motion for partial summary judgment. Plaintiff seeks a determination from the court that its contract for providing electric service to McChord Air Force Base (Base) is an invalid perpetuity and therefore the court should determine a "reasonable" term. After consideration of the submissions of the parties, and after hearing oral argument, the court grants defendant's motion for summary judgment and denies plaintiff's partial motion for summary judgment.[1]

## FACTS

The following facts are undisputed. Plaintiff, the City of Tacoma, Department of Public Utilities (City), and the Department of the Air Force (Air Force) entered into Contract No. F45603–73–C–0009 (1972 contract), for the purchase of electrical services for

1. Both parties have moved for summary judgment on the issue of liability. There are no disputed material facts. Plaintiff has labeled its motion for summary judgment as "Partial" so as to indicate that only liability, and not liability and damages, is at issue and is the focus of the motions before the court.

2. The General Provisions provided rate changes would be renegotiated and would become effective as mutually agreed. The Rate Provisions, at all times material to this case, read as follows:

 3. CHANGE OF RATES

McChord Air Force Base (Base), on November 20, 1972. The Base is a Federal enclave located near the City of Tacoma in Pierce County, Washington. The Base does not have its own prime electric power generation capacity and must purchase electric power from a source outside the Federal enclave. While the Base possibly could have purchased electricity from any one of a number of potential suppliers, the City, under previous contracts, has provided electrical services to the Base since 1938. Pursuant to the terms and conditions of the 1972 contract, the City has provided electric utility services to the Base over the last twenty-four years.

Prior to the contract at issue, the parties entered Contract No. AF 45(603)–297 dated May 1, 1957. The initial term of Contract No. AF 45(603)–297 was ten years. Neither party has any record of a contract for electrical services from 1967 to 1972, and it appears that the City continued service under Contract No. AF 45(603)–297 during the intervening time period.

During the 1972 contract's performance period, the contract has been modified approximately fifteen times, including several changes pursuant to the contract's change of rates provision.[2]

Paragraph I of the 1972 contract, entitled "SCOPE," provides in pertinent part:

 Subject to the terms and conditions hereinafter set forth, the Contractor shall furnish, and the Government shall purchase and receive, Electrical service (hereinafter called service) requested by the Government from the Contractor at the premises to be served hereunder (hereinafter called the service location), in accordance with the General and Technical Provisions and

 At the request of either party to this contract with reasonable cause, the rates set forth herein shall be renegotiated and the new rates shall become effective as mutually agreed PROVIDED that any rates so negotiated shall not be in excess of rates to any other customer of the Contractor under similar conditions of service. No increase shall be requested in the contract rate unless the Contractor has placed into effect a general rate increase to all of his customers under similar conditions of service. If the Contractor has placed into effect a general rate decrease, a corresponding decrease in the contract rate shall be made.

the Electrical service specifications attached hereto and made a part hereof.

Paragraph II of the 1972 contract, entitled "TERM," states as follows:

This contract shall continue in effect until terminated at the option of the Government by the giving of written notice not less than 30 days in advance of the effective date of termination.

The provisions of paragraphs I and II of the 1972 contract are located on page two of the contract immediately above the signatures of Fred J. May, Air Force contracting officer, and Gordon J. Johnston, Mayor of the City. Page two of the contract also contains signatures of H.B. Bond, Clerk for the City, A.J. Benedetti, Director of Utilities, and Paul J. Nolan, Deputy City Attorney.

Prior to the execution of the November 20, 1972 contract, the contracting officer, Fred May, forwarded a proposed utility services contract format to the City on May 19, 1972. As part of the proposed contract format, the contracting officer included the term provision that "the contract shall continue in effect until terminated at the option of the Government by the giving of written notice not less than 30 days in advance of the effective date of termination." By letter dated June 1, 1972, J.D. Cockrell, the City's Superintendent of the Light Division, responded to the Air Force's proposed contract format. With respect to the "TERM" provision, Superintendent Cockrell stated that "We believe this should be changed to provide for termination by either party, rather than the Government only, upon thirty days' written notice." Contracting officer May replied, in pertinent part, by letter dated June 12, 1972, that the "TERM" provision:

is a standard provision of Government utility contracts, acceptable to other utility companies, and has the same effect as para 8 of Contract AF 45(603)297.[3] We can foresee no circumstances wherein the City of Tacoma would wish to terminate this utility service as long as the Government still had a requirement for electricity.

Also in this letter, the contracting officer proposed additional changes to the contract format in response to suggestions from the City. The letter concluded with a request that the City "review the points covered, and if satisfactory, advise ... by letter not later than 16 June 1972 that the format is acceptable to you and that the City of Tacoma would be willing to sign a contract in the above format, with the changes agreed to...."

On June 14, 1972, Superintendent Cockrell wrote that the City had "reviewed the points covered in your letter of June 12, 1972 and concur that the format of the Utility Service Contract is acceptable....." Furthermore, Cockrell stated that "[W]e will be pleased to recommend to our Utility Board execution of the Utility Services Contract...."

On September 28, 1972, contracting officer May forwarded copies of the contract to the City for execution on or before October 10, 1972. Superintendent Cockrell responded that the City would be unable to return signed copies prior to November 10, 1972 because the City required "adequate time for staff review and approval by the Public Utility Board and Tacoma City Council prior to execution...." During the City's review an exception to the "TERM" provision was raised by D.J. Caha, Power Manager of the Department of Public Utilities. In an October 3, 1972 interoffice communication to Cockrell, Caha stated that:

... The contract has been reviewed by Legal and Power Management staff and is considered acceptable for signature with one significant exception.

The exception relates to the fact that the contract is unilaterally cancelable by the Government on 30 day's prior notice. While that provision would be acceptable as it relates. to the existing service, it would seem that any future capital expenditures made to McChord service facilities would be the subject of a separate agreement.

If you feel that such an arrangement is adequate, please advise and we will pro-

---

3. Paragraph 8 provides:

TERMINATION: This contract may be terminated at the option of the Government by the giving of not less than thirty (30) days advance written notice of the effective date of termination.

ceed with preparation of request for necessary Board and Council action.

In an October 16, 1972 interoffice communication from Cockrell to A.J. Benedetti, Cockrell noted, *inter alia*, that the "TERM" provision proposed by the Air Force conformed to the Federal Standard Contract Format. Cockrell further noted an "important" difference between the 1972 proposed contract and the prior 1957 contract, namely that the "Term has been changed from ten years to unspecified term with 30 day cancellation option reserved by the Government." Cockrell advised that "The proposed contract has been reviewed by the Legal staff and is considered in acceptable form and adequate for our needs. Execution of the document is hereby recommended." Under "APPROVED:" A.J. Benedetti, the Director of Utilities, initialed the document.

Subsequently, by Resolution No. U–4045, dated October 25, 1972, the City's Public Utility Board approved the contract. On October 31, 1972, the Council of the City of Tacoma adopted Resolution No. 21914. Resolution No. 21914 provides:

WHEREAS the City of Tacoma, Department of Public Utilities, Light Division, has provided the United States of America, Department of the Air Force, electric energy requirements for McChord Field, pursuant to an agreement adopted with Utility Board and Council approval dated June 17, 1957, and

WHEREAS the said agreement has expired and a new agreement has been proposed and approved by the Air Force pursuant to the Federal Standard Contract Format, a copy of which is attached hereto and by this reference incorporated herein, and

WHEREAS said proposed contract has been recommended for approval by the director of Utilities, and it is in the best public interest that it be formally approved and executed; Now, therefore,

BE IT RESOLVED BY THE COUNCIL OF THE CITY OF TACOMA:

That the said agreement is approved and the proper officers of the City are hereby authorized and directed to execute the said agreement substantially in the form as that referred to herein, and to be approved by the City Attorney.

The 1972 contract has been the subject of prior litigation between the parties. *See City of Tacoma, Dept. of Pub. Utilities v. United States*, 28 Fed. Cl. 637, 641 (1993). In 1990, the City submitted two claims to the contracting officer. The City's first claim, dated May 11, 1990, sought $820,284.17 for the Air Force's refusal to pay electric rates in accordance with the City's duly enacted electric ordinance rate schedule. The contracting officer issued a final decision on June 12, 1990, granting the City partial relief in the amount of $531,376.35 which represented the undisputed amount of the claim. The second claim dated September 24, 1990, sought termination of the contract because of the parties' failure to reach agreement over the rate changes. On October 5, 1990, the contracting officer denied the City's claim and directed the City to continue service in accordance with the contract.

The City timely appealed both final decisions of the contracting officer to this court. In its complaint the City argued that the contract: (1) is contrary to a federal continuing appropriations act; (2) is contrary to state law; (3) contains latent ambiguities; (4) is illusory; and (5) is an invalid perpetuity. In its June 22, 1993 decision, the court rejected each of these claims, and granted defendant's cross-motion for summary judgment on all counts of the complaint and dismissed the City's complaint.[4] *City of Tacoma*, 28 Fed. Cl. 637. The City appealed the court's judgment. The United States Court of Appeals for the Federal Circuit affirmed the trial court's decision. *See City of Tacoma, Dept. of Pub. Utilities v. United States*, 31 F.3d 1130 (Fed.Cir.1994).

The Federal Circuit did not directly address the merits of the City's contention that the contract is an invalid perpetuity, because the City did not properly include this claim in

**4.** The trial court found that "plain language of the contract as a whole establishes that the Term, the Change of Rates, and the Disputes provisions are not ambiguous, conflicting or illusory, and taken together, they do not create an invalid perpetuity." *City of Tacoma*, 28 Fed. Cl. at 644.

its certified claim to the contracting officer. *City of Tacoma,* 31 F.3d at 1134–35. By letter dated June 6, 1995, the City filed a claim with the contracting officer stating its position that "the contract term, being indefinite, is legally binding only for a 'reasonable' period of time." The City requested that the contracting officer "determine the 'reasonable' term of [the contract]. Further, the contractor requests that the contracting officer specify a termination date for this contract, based on a determination of the 'reasonable' duration of an indefinite contract of this type."

The contracting officer denied the City's June 6, 1995 claim in a final decision dated July 25, 1995. The contracting officer's decision stated, in part, that the City:

> has presented no distinct reason or reasons in its request for Contracting Officer decision as to why the indefinite term of the contract should be changed or is otherwise unreasonable. Moreover, McChord AFB attempted to conduct discussions with [the City] regarding possible bases for modification of the contract, but your letter terminated those discussions without offering any counterproposal or basis for rejection. The term of the contract as set forth in schedule item II states "This contract shall continue in effect until terminated at the option of the Government by the giving of written notice not less than 30 days in advance of the effective date of termination". The contract was lawful and mutually acceptable at the time it was entered, and complied with all statutory law and regulations applicable to utility contracts. The indefinite term of the contract is compatible with current Federal and Department of Defense contracting regulations. Accordingly, the term as set forth in the contract is reasonable.

Thereafter, the City filed its complaint in this court on October 23, 1995. The City requests that the court: (1) declare that the contracting officer erred in denying the City's request that the contracting officer specify a "reasonable" date upon which the

contract would terminate; (2) issue a declaratory judgment concerning the "reasonable" duration of the contract; and (3) issue a declaratory judgment specifying a "date certain" when the contract will be considered terminated.[5]

## DISCUSSION

 The essential issue in this dispute is whether the parties' indefinite term contract is an invalid perpetuity. This is a question of contract interpretation, and as such summary judgment is appropriate. Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c). The movant has the burden of demonstrating that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Cross motions require the court to "evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987).

Defendant asserts in its motion for summary judgment that: (1) the language of the contract providing that the contract shall continue in effect until terminated at the option of the government is clear and ambiguous; (2) the contract's termination provision accords with government procurement regulations; and (3) assuming, *arguendo,* that the contract is ambiguous, parol evidence indicates that the parties clearly intended, at the inception of the contract, that the contract would continue in effect, indefinitely, unless terminated at the option of the government.

The City's response to defendant's arguments is based on the general rule that contracts for a virtual perpetuity are disfavored at law. Therefore, the City argues, "sum-

---

**5.** Neither party contests the jurisdiction of the court to decide this case, wherein plaintiff does not seek a money judgment but seeks, in sub-

stance, a declaratory judgment. *See* 28 U.S.C. § 1491(a)(2) (1994); *Alaska Pulp Corp. v. United States,* 38 Fed. Cl. 141, 145 (1997).

mary judgment should be entered that this is an indefinite term contract, with a reasonable duration to be determined by the court, after the consideration of all the circumstances."

It is well established that "Federal law and not state law controls the interpretation of contracts between the United States and local governments that derive their authority from a state." *City of Tacoma,* 28 Fed. Cl. at 642 (citing *United States v. Allegheny,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944)), *aff'd,* 31 F.3d 1130. When resolving a question of contract interpretation, the court's primary purpose is to ascertain the intention of the contracting parties, *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988), as the parties' intention controls a contract's interpretation. *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless, *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985), and an agreement should be read as a whole so as to avoid conflicts between provisions within the contract. *Reliance Ins. Co. v. United States,* 931 F.2d 863, 865 (Fed.Cir. 1991). The court must give meaning and effect to the intentions of the parties as expressed in the language of the contract. *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993).

Contract interpretation constitutes an objective test, and the standard is what a similarly situated, reasonably prudent contractor would have understood the contract language to mean, not what the drafter or any other party subjectively intended the contract to mean. *City of Oxnard v. United States,* 851 F.2d 344, 347 (Fed.Cir.1988). As stated by the Federal Circuit, the "principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir.1995), *aff'd,* —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

The City does not dispute that the contract at issue is an indefinite term con-

tract. The contract's termination provision states in full:

> This contract shall continue in effect until terminated at the option of the Government by the giving of written notice not less than 30 days in advance of the effective date of termination.

The City, without pointing to any ambiguous language in the contract, argues that the contract is ambiguous. Indeed, the fact that the parties agree that the contract is for an indefinite term indicates that the contract is not ambiguous. Instead, the City argues that "this case turns on the question of the ambiguity inherent in a contract with an indefinite term. If there is no term stated, the natural question arises as to the duration of the contract." The City, however, cites no support for its novel proposition that indefinite term contracts are inherently ambiguous. While indefinite term contracts may be disfavored by the courts, they are not *per se* ambiguous.

The City mistakes the judicial reluctance to enforce indefinite term contracts for an invitation to defeat the unambiguously expressed intent of the parties. In *Consumers Ice Co. v. United States,* 201 Ct.Cl. 116, 475 F.2d 1161 (1973), the Court of Claims recognized "the judicial reluctance to lock parties into a given set of rights and obligations for long or indefinite periods without some clear indication that this was actually intended by the parties." *Consumers Ice,* 201 Ct.Cl. at 126, 475 F.2d at 1166–67. *Consumers Ice* involved the interpretation of a lease agreement's termination clause. Consumers Ice Company argued that the agreement provided for a fixed expiration date, while the defendant argued that the lease was to continue in effect until the Army determined that it no longer needed the premises. After determining that the language of the lease was ambiguous on its face, the court ultimately held that Consumers Ice Company's interpretation of the ambiguous contract was preferable given the judicial reluctance to interpret such contracts to provide for an indefinite period. However, the Court of Claims stated:

> The fact that a contract leaves indefinite the period for performance will not usually

invalidate it or make it unenforceable, but the longer the period for performance the heavier the burden on the enforcing party to prove that the extended duration was intended.

*Consumers Ice,* 201 Cl.Cl. at 125, 475 F.2d at 1166. In this case the intent of the parties is explicitly expressed by the contract's clear and unambiguous language. Accordingly, the court need not determine a "reasonable" term.

In *Florida Keys Aqueduct Auth. v. United States,* 7 Cl.Ct. 297 (1985), *aff'd* 790 F.2d 95 (Fed.Cir.1986) (Table), this court found a term provision similar to the 1972 contract's term provision to be unambiguous. The water services utility contract between the plaintiff and the Department of the Navy included the following term provision:

> This contract shall be for a term often (10) years from the date hereof and thereafter until terminated at the option of the government by the giving of written notice not less than thirty (30) days in advance of the effective date of termination.

*Id.* at 299. The plaintiff in *Florida Keys* raised an argument similar to the one advanced by the City in the instant case. The plaintiff contended that the contract, because it was for an indefinite term, should be construed to be terminable by it upon reasonable notice. *Id.* at 300. The court rejected plaintiff's argument because "the clause pertaining to the period of performance [was] clear and unambiguous.... [and] the language indicates that the parties had in mind a contract with a duration limited only by the government's right to terminate." *Id.* In addition to the clear and unambiguous language of the contract, the *Florida Keys* court's examination of the circumstances underlying the contract indicated that the parties intended that the plaintiff would be bound to supply water to the government as long as the government required potable water. The court stated that one "indication that the parties intended the contract to be long term and not merely for a limited period may be found in the provisions that the rates were not fixed but were to be renegotiated annually...." *Id.* As noted previously, the contract at issue in this case also contains a

rate renegotiation provision, and during the contract performance period several changes have been made pursuant to it.

▉▉▉▉ Contract interpretation may be aided, within limits, by an examination of the circumstances surrounding formation. The parol evidence rule bars the introduction of extrinsic evidence antecedent to or contemporaneous with contract formation for the purpose of adding to, subtracting from, varying, or contradicting the terms of a written contract, which is final complete, unambiguous, and unaffected by mistake, fraud, or accident. *Conoco Inc. v. United States,* 35 Fed. Cl. 309, 325 (1996). The court, however, may use certain extrinsic evidence for the limited purpose of explaining the circumstances affecting a contract by shedding light on the parties' objective intent. *Id.*

In this case the correspondence between the parties and also the City's interoffice communications, indicate that the parties' objective intent at the time of formation was to enter an indefinite term contract which could be terminated by the government with thirty days notice. The correspondence shows that the City obviously considered the proposed indefinite contract term to be an important difference from its prior utility contract with the Air Force. During negotiations, the City specifically requested, among other things, that the contract include a provision that would permit the City to terminate the contract. The contracting officer refused the City's request noting that the contract termination provision was a standard term of government utility contracts. After the proposed contract had been reviewed by "the Legal staff and by the Power Management staff and [was] considered in acceptable form and adequate for [the City's] needs," the Director of Utilities recommended execution of the contract. Moreover, the Tacoma City Council and Public Utility Board determined that execution of the contract would be "in the best public interest." Accordingly, the circumstances surrounding the contract's formation support the conclusion that the parties intended to enter an indefinite term contract which could be terminated by the government.

**590**

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied. The clerk is directed to dismiss plaintiff's complaint. No costs.